IN THE UNITED STATES DISTRICT COURT
For The Western District of Pennsylvania

| | | |
|---|---|---|
| Harry L. Bierley, Plaintiff | : | |
| V | : | Civil Action No. 05-007E |
| Jo Anne B. Barnhart, Commissioner of Social Security, Defendant | : | Judge Sean McLaughlin<br>Mag Judge Susan Paradise Baxter |

Motion For Reconsideration

1. And now comes the pro se plaintiff, Harry L. Bierley, before the Honorable Court to request reconsideration of the order dated June 27, 2005 that denied me the requested and required medical records on James Hibbler. The Court has committed grave plain error by allowing me to be victimized by criminal fraud, criminal misconduct of Erie County Officials, and criminal violations of my civil rights per 18 U.S.C. 241 and 242 compounded by criminal complicity by the Social Security Commission.

2. Those medical records are needed for me to disprove claims by the Social Security Commission, that, I knowingly did wrong by accepting payments for a period of time that I was legally incarcerated. That is an untrue claim, as, at NO TIME during the illegal prosecution (persecution), sham trial, and illegal incarceration on CP 38 of 90, Erie Co., PA, Com V Bierley, did I ever believe that the prosecution or conviction were legal in any manner. I knew from the first minute of the first day that I was being railroaded to silence my vociferous condemnations of Erie County judicial misconduct.

3. Per Hazel-Atlas Glass Co., V Hartford Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944), When fraud of any sort is involved in a judgment, it is NEVER final until that fraud is illuminated, and, it is decided that the fraud was not in any way responsible for a negatory outcome. Likewise then, if I am fraudulently denied the medical records needed to prove that I did NO WRONG in accepting the instantly relevant social security payments, the judgment will be invalid and open to collateral attack ad infinitum.

4. In the instantly relevant CP 38 of 90, Erie Co., PA criminal "conviction", per Brady V MD, 373 U.S. 83, 87, I was wrongfully denied extremely exculpable medical records that I asked for from day one but NEVER saw. I could have disproved testimony by ALL THREE primary Commonwealth witnesses who committed perjury with full awareness and full approval of the "court", DA, ADA, and others. Instead of only the one injury from the shovel I used after the first of three vollies of missiles were hurled at me, I could have proved there were several different kinds of lacerations that numbered ten or more.

The illogical alternative to those injuries being made by many different missles that were meant for me would be to assume that I beat Hibbler three or four times with one instrument, put it down and picked up another instrument

that I used to beat Hibbler three or four times, then put that one down and picked up a third instrument to beat him three or four more times.

At the sham trial, a hypocritical effort was made to make me appear to be severely psychiatrically ill due to a physical characteristic of my voice box. I have an omega eppiglottis which causes a syndrom called Singer's Formant. That means, when I am excited in any manner, my voice automatically and involuntarily switches to a high volume and high carry capacity. Per the attached pages, the Court can see that I was recently diagnosed again with the omega eppiglottis. Other pages explain incidence of omega eppiglottis and singer's fromant.

5. The "conviction" was possible ONLY because of deprivation of those medical records prior to "trial" and denial to my new counsel at "trial" of them.

6. Mt rights per the Confrontational Clause of the U. S. Constitution were grievously violated, because, without the medical records, My attorney was not able to address many questions I wanted answers to from state witnesses. With them, I could have convinced the jury that I was the victim and NOT the perpetrator of the attack. One juror, Robert Allen immediately recanted and wrote a letter to "judge" Connelly and Counsel Jack Grayer. Mr. Grayer entered that letter into the record, but later, like the medical records, the letter disappeared from the caseprint file.

7. I assert under penalty of perjury, that, if this Court and the Social Security Admin follow through with the pretension that those medical records are NOT needed for a justiciable review of the instant matter, ALL PARTIES, i.e., MJ Baxter, J McLaughlin, Social Security Commissioner Barnhart, ADA Paul Skirtich and the U. S. Attorney General will be guilty of violating 18 U.S.C. 241 and 242 by concealment of, complicity to, and compounding of crimes of kidnapping, false imprisonment, severe oppression, perjury, and much more.

8. The answer by Ms Barnhart and Esq. Skirtich clearly implies that I was legally incarcerated and I knew I was legally incarcerated on CP 38 of 90. However, neither averement is even remotely truthful.

9. With the medical records from James Hibbler, I can prove that their averements are untrue. For this reason, those medical records are inextricably intertwined with my claims and their claims against me. Therefore, those records MUST be made available to me.

10. Everyone who is aware of a crime, especially one as serious as kidnapping, no matter how the crime was done and no matter how he/she became aware of the crime, is responsible AND dutybound to aid prosecution for that crime. They are guilty of criminal complicity if they fail to report the crime and aid the prosecution thereof.

11. Perhaps the facts in ten above are new to the persons named in number seven above. If that is so, they are all criminally incompetent and they should instantly remove themselves from public office.

12. Perhaps my dictionary is a little strange, but, my Random House Dictionary gives me the unmistakeable impression that Social Security Administrators, U. S. Attornies, ALJs, MJs, and U. S. District Court Judges are included in the word e-v-e-r-y-b-o-d-y. Please correct me if I am wrong folks.

13. And now I refer the readers to attached caselaw Nilson V Layton City, 45 F3d 369 (10th Cir 1995) which appears to cover every aspect of abuse of privacy and applicable law. It clearly defines the unavoidable impression that right to privacy laws are being wrongfully used to harm me.

14. I am NOT asking for generalized information nor am I requesting information on the serious mental infirmities that I know Mr. Hibbler posseses. My request is limited to medical records evolving from a confrontation between him and me on my property, at aproximately 5:00 P.M., November 5, 1989.

15. HN 1 assigns the right of privacy to be a question of federal law. However, I am being denied evidence that will prove that Hibbler invaded my privacy rights on my own property on Nov. 5, 1989.

16. HN 4 intones that the party on whose behalf privacy right is asserted must have a legitimate expectation of that right. The entire incident ocurred on MY PROPERTY. Those records were part of a public document per caseprint and record on CP 38 of 90 and that removes all expectations of privacy thereto. The fact that those medical records have been removed from the record and kept hidden by three successive Erie Co., PA DAs does NOT alter that status. They were removed to prevent me from prosecution "judge" Shad Connelly, then DA Wm R. Cunningham and the ADA for 18 U.S.C. 241 and 242 violations.

17. HN4 intones that the invasion of privacy must serve a compelling state interest. There is a compelling interest for the citizens of Pennsylvania and Erie County to know that "judge" Shad Connelly and "judge" Wm R. Cunningham (formerly the DA) are guilty of serious criminal wrongdoing.

18. HN4 intones that the disclosure be done in a least intrusive manner. I am requesting ONLY the medical records emanating from a massive assault against me on my own property at aprox. 5:00 P.M., November 5, 1989.

19. HN6 intones that information readily available to the public is NOT protected by privacy rights. Those medical records were used to illegally prosecute me and forceably convict me of a felony by use of perjury. They were part of the public record on CP 38 of 90 until someone criminally altered the records by removal of them from the record. Both the public and myself have the right to see them. Illegal removal from the record does NOT change their public status.

20. Therefore per HN7 the governments disclosure of the requested medical records will NOT implicate the privacy rights of Mr. Hibbler. Denial of those records implicate my rights per the confrontation clause of our constitution. and, it implicates the publics right to be informed of criminals in public office like Shad Connelly and Wm R. Cunningham.

21. HN9 clearly states that "Criminal activity is not protected by the right to privacy." Therefore, my use of those records to prove that Mr. Hibbler, Ms. Hibbler, Mr. Fogel, and others committed perjury with full and known acquiescense of the DA, ADA, and "Court" is not a protection that this Honorable Court should extend to Mr. James Hibbler.

22. HN14 intones that my due process rights that are being violated by the

deprivation of those medical records on James Hibbler are fundamental constitutional rights. Therefore, they are NOT amenable to federal doctrines of abstention, comity, and federalism.

23. HN17 is a reitteration of HNs 4, 6, 7, 9, and 14 mentioned above.

24. Per caselaw Bank of Nova Scotia V U.S., HN3, Fed Crts3, Even sensible and efficient use of supervisory power by federal courts is invalid if it conflicts with constitutional or statutory provisions

25. Therefore, the plaintiff has shown the Honorable Court that it should NOT deprive me of the medical records needed to prove the illegality of the incarceration and the perjury used to gain the "conviction" at CP 38 of 90.

26. Wherefore, plaintiff Harry L. Bierley, does move the Honorable Court to reverse the denial of medical records on 6/27/05 and recant the statement: ..."such medical records are irrelevant to the disposition of this case." It Is So Prayed.

Respectfully submitted,

Harry L. Bierley, pro se/in pro per

C.O. L. Kowalski
3123 German Street
Erie, PA 16504-1073
Ph: 1 814 454 2550

Certificate of Service

On this date, 8 July 2005, I did personally serve a copy of the above Motion For Reconsideration upon the U. S. Attorney office in the Federal Courthouse in Erie, PA.

**Demar NILSON, Plaintiff–Appellant,**

**v.**

**LAYTON CITY and Rex Brimhall, Defendants–Appellees.**

**No. 94–4077.**

United States Court of Appeals, Tenth Circuit.

Jan. 6, 1995.

Former teacher filed § 1983 action against city and police officer alleging violations of his constitutional right to privacy following officer's disclosure in televised news broadcast of expunged prior sexual abuse conviction. The United States District Court for the District of Utah, Daniel K. Winder, Chief Judge, entered verdict in favor of defendants. Former teacher appealed. The Court of Appeals, Seymour, Chief Judge, held that: (1) officer's disclosure of expunged prior sexual abuse conviction did not violate teacher's privacy rights, and (2) state expungement statute did not create legitimate expectation of privacy in expunged arrest and conviction.

Affirmed.

**1. Constitutional Law ⟹82(7)**

Constitutional right of privacy is question of federal law. U.S.C.A. Const.Amend. 14.

**2. Federal Courts ⟹776**

Whether police officer's postexpungement disclosure of former defendant's criminal history violated former defendant's right to privacy is question of law reviewed de novo. U.S.C.A. Const.Amend. 14.

**3. Constitutional Law ⟹274(5)**

Due process clause of the Fourteenth Amendment protects individuals from state intrusion on fundamental aspects of personal privacy. U.S.C.A. Const.Amend. 14.

**4. Constitutional Law ⟹82(7)**

In determining whether information is of such a personal nature that it demands constitutional protection, Court of Appeals must consider the following: (1) if party asserting right has legitimate expectation of privacy; (2) if disclosure serves compelling state interest; and (3) if disclosure can be made in the least intrusive manner. U.S.C.A. Const. Amend. 14.

**5. Constitutional Law ⟹82(7)**

Expectations of privacy are legitimate if information which the state possesses is highly personal or intimate. U.S.C.A. Const. Amend. 14.

**6. Constitutional Law ⟹82(7)**

Information readily available to public is not protected by constitutional right to privacy. U.S.C.A. Const.Amend. 14.

**7. Constitutional Law ⟹82(7)**

Government disclosures of any records, judicial proceedings, or information contained in police reports do not implicate right to privacy. U.S.C.A. Const.Amend. 14.

**8. Constitutional Law ⟹82(7)**

Validly enacted law places citizens on notice that violations thereof do not fall within realm of privacy. U.S.C.A. Const.Amend. 14.

**9. Constitutional Law ⟹82(7)**

Criminal activity is not protected by right to privacy. U.S.C.A. Const.Amend. 14.

**10. Constitutional Law ⟹82(7)**

**Criminal Law ⟹1226(3.1)**

Police officer's disclosure in television news broadcast of expunged prior sexual abuse conviction of teacher did not breach teacher's privacy rights; teacher was on notice that violations of laws proscribing sexual abuse did not fall within constitutionally protected privacy realm, and expunged arrest and conviction did not erase firsthand knowledge of officer as to teacher's arrest and conviction, and thus teacher did not have legitimate expectation of privacy in his expunged criminal records. U.S.C.A. Const. Amend. 14; 42 U.S.C.A. § 1983; U.C.A.1953, 77–18–2(5)(a) (Repealed).

**11. Criminal Law** ⚷1226(3.1)

Expungement order does not privatize criminal activity.

**12. Constitutional Law** ⚷82(7)

Expunged arrest and/or conviction is never truly removed from public record, and thus is not entitled to privacy protection; while expungement order removes particular arrest and/or conviction from an individual's criminal record, the underlying object of expungement remains public, given that court records and police blotters permanently document the expungement incident, and those officials integrally involved retain knowledge of the event. U.S.C.A. Const.Amend. 14.

**13. Constitutional Law** ⚷274(5)

Existence of state expungement statute did not create legitimate expectation of privacy in teacher's expunged criminal records; substantive due process rights were not founded upon state law. U.S.C.A. Const. Amend. 14; U.C.A.1953, 77–18–2(5)(a) (Repealed).

**14. Constitutional Law** ⚷251

Substantive due process rights are founded not upon state law but upon deeply rooted notions of fundamental personal interests derived from the Constitution. U.S.C.A. Const.Amend. 14.

**15. Constitutional Law** ⚷82(7)

While state statutes and regulations may inform court's judgment regarding scope of constitutional rights, they fall far short of kind of proof necessary to establish reasonable expectation of privacy. U.S.C.A. Const. Amend. 14.

**16. Civil Rights** ⚷234

Mere allegations that official failed to abide by state law will not suffice to state constitutional claim.

**17. Constitutional Law** ⚷82(7)

For violation of right to privacy, disclosed information itself must warrant constitutional protection. U.S.C.A. Const.Amend. 14.

---

Robert H. Copier, Salt Lake City, UT, for plaintiff/appellant.

Anne Swensen (Julianne P. Blanch, with her on the briefs) of Snow, Christensen & Martineau, Salt Lake City, UT, for defendants/appellees.

Before SEYMOUR, Chief Judge, LOGAN, and EBEL, Circuit Judges.

SEYMOUR, Chief Judge.

Demar Nilson brought this 42 U.S.C. § 1983 action alleging violations of his constitutional right to privacy because a Layton City official publicized an expunged portion of his criminal record. In a bench trial, the district court rejected Mr. Nilson's claim, and he appeals. We affirm.

I.

In 1981, while a school teacher in the Davis County School District, Mr. Nilson pled no contest to forcible sexual abuse charges. Although charged in Davis County, Mr. Nilson was arrested and booked in Layton. The court sentenced him to one year of suspended jail time, indefinite probation, and a $1,000 fine. The Davis County School District terminated Mr. Nilson's employment, and the state revoked his teaching certificate for approximately one year. In 1984, the Jordan School District in Salt Lake County hired Mr. Nilson. On motion of Mr. Nilson, a district judge in Davis County entered an Order of Expungement on July 23, 1990, pursuant to Utah Code Ann. § 77–18–2 (1990).[1] The court never filed the expungement order with Layton or any Layton official.

The Jordan School District began receiving information and complaints regarding Mr. Nilson's prior criminal history in 1990. Soon thereafter, the Salt Lake County Sheriff's Office learned of Mr. Nilson's past conviction and received new complaints of sexual abuse by Mr. Nilson. Salt Lake County began investigating these new sexual abuse allegations and charged Mr. Nilson in 1991 with forcible sexual abuse.

On October 23, 1991, Sergeant Brimhall of the Layton Police Department discussed Mr. Nilson's prior conviction with Steve Eager of KSL–TV. As a Layton police officer in 1981, Sergeant Brimhall had first-hand knowledge of Mr. Nilson's arrest and conviction. However, because no one filed the expungement order with any Layton official or agency, the Layton records did not provide knowledge of the expungement, and it is unclear from the district court's findings whether Sergeant Brimhall actually knew of the expungement. Following his discussion with Sergeant Brimhall, Mr. Eager reported on the evening news that Layton had arrested and convicted Mr. Nilson for child abuse in 1981 and that some time thereafter his record was expunged. Also on the October 23 broadcast, two of Mr. Nilson's former Davis County students anonymously claimed to be victims of his sexual abuse. The charges and the news broadcast received substantial publicity.

Although Mr. Nilson was not convicted of the 1991 charges, the Jordan School District terminated his employment in 1992. Mr. Nilson then filed this section 1983 action against Layton and Sergeant Brimhall, alleging that Sergeant Brimhall's post-expungement interview with Mr. Eager and the ensuing media publicity violated his constitutional right to privacy. The district court concluded that neither Layton nor Sergeant Brimhall had first-hand knowledge of the expungement order and therefore did not violate Utah Stat.Ann. § 77–18–2(5)(a). Because defendants were not liable under section 77–18–2, the court further concluded, they could not be held liable under section 1983.[2]

II.

[1] On appeal, Mr. Nilson argues that the district court's analysis was misguided. He contends that the constitutionally-rooted right to privacy is a question of federal law, and the relevant inquiry is whether he had a legitimate expectation of privacy in his expunged criminal records. Mr. Nilson further argues that the Utah expungement statute created a legitimate expectation of privacy, and violations thereof implicated his constitutional right to privacy. We agree with Mr. Nilson's assertion that the constitutional right of privacy is a question of federal law, but we disagree that he had a legitimate expectation of privacy in his expunged criminal records.

[2–4] Whether Sergeant Brimhall's post-expungement disclosure of Mr. Nilson's criminal history violated Mr. Nilson's right to privacy is a question of law which we review de novo. *Estate of Holl v. Commissioner of Internal Revenue*, 967 F.2d 1437, 1438 (10th Cir.1992). The Due Process Clause of the Fourteenth Amendment protects individuals from state intrusion on fundamental aspects of personal privacy. *See Roe v. Wade*, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973). The Supreme Court has held that the right to privacy safeguards individuals from government disclosure of personal information. *See Nixon v. Administrator of Gen'l Serv.*, 433 U.S. 425, 457, 97 S.Ct. 2777, 2797, 53 L.Ed.2d 867 (1977); *Whalen v. Roe*, 429 U.S. 589, 599 & n. 24, 97 S.Ct. 869, 876 & n. 24, 51 L.Ed.2d 64 (1977). In determining whether information is of such a personal nature that it demands constitutional protection, we must consider "(1) if the party asserting the right has a legitimate expectation of privacy, (2) if disclosure serves a compelling state interest, and (3) if disclosure can be made in the least intrusive manner." *Denver Policemen's Protective Ass'n v. Lichtenstein*, 660 F.2d 432, 435 (10th Cir.1981). Because the alleged unconstitutional conduct in this case fails to meet the first prong of this test, we hold that Mr. Nilson has no constitutional right to privacy in his expunged criminal record.

1. Utah Stat.Ann. § 77–18–2(5)(a) (1990) (repealed 1994) states in relevant part: "The Utah Bureau of Criminal Identification shall keep, index, and maintain all expunged and sealed records of arrests and convictions. Any agency or its employee who receives an expungement order may not divulge any information in the sealed expunged records."

2. The district court also found that Sergeant Brimhall's media disclosures did not proximately cause Mr. Nilson's injuries. Because we conclude that the constitutional right to privacy does not protect Mr. Nilson's expunged criminal record, we do not reach the causation issue.

[5–7] Expectations of privacy are legitimate if the information which the state possesses is highly personal or intimate. *Mangels v. Pena,* 789 F.2d 836, 839 (10th Cir. 1986). Information readily available to the public is not protected by the constitutional right to privacy. Consequently, government disclosures of arrest records, *see Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), judicial proceedings, *see Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 492, 95 S.Ct. 1029, 1044, 43 L.Ed.2d 328 (1975), and information contained in police reports, *see Scheetz v. The Morning Call, Inc.,* 946 F.2d 202, 207 (3d Cir.1991), *cert. denied* — U.S. —, 112 S.Ct. 1171, 117 L.Ed.2d 417 (1992), do not implicate the right to privacy.

[8–10] Furthermore, a validly enacted law places citizens on notice that violations thereof do not fall within the realm of privacy. *Mangels,* 789 F.2d at 839. Criminal activity is thus not protected by the right to privacy. In *Mangels,* the Denver Fire Department publicized in the media its dismissal of two employees for drug usage. The firefighters argued that the disclosure of this information implicated their right to privacy. We concluded that information concerning unlawful activity "is not encompassed by any right of confidentiality, and therefore it may be communicated to the news media." *Id.* at 839 (footnote omitted) (citing *Paul v. Davis,* 424 U.S. at 712–13, 96 S.Ct. at 1165–66). In our judgment, the holding in *Mangels* controls here. Mr. Nilson pled no contest to charges of forcible sexual abuse in 1981. Laws proscribing sexual abuse place Mr. Nilson on notice that violations thereof do not fall within the constitutionally protected privacy realm. Consequently, Sergeant Brimhall's interview with Mr. Eager, during which he discussed the 1981 sexual abuse charges and conviction, did not breach Mr. Nilson's privacy rights.

[11, 12] The 1990 expungement order does not change this conclusion. An expungement order does not privatize criminal activity. While it removes a particular arrest and/or conviction from an individual's criminal record, the underlying object of expungement remains public. Court records and police blotters permanently document the expunged incident, and those officials integrally involved retain knowledge of the event. An expunged arrest and/or conviction is never truly removed from the public record and thus is not entitled to privacy protection. Mr. Brimhall, as an officer in the Layton police department in 1981, had first-hand knowledge of Mr. Nilson's arrest and conviction. The expungement order did not erase this knowledge. We hold that Mr. Nilson did not have a legitimate expectation of privacy in his expunged criminal records.

[13–17] Mr. Nilson argues that the Utah expungement statute created the legitimate expectation of privacy, and that Sergeant Brimhall's violation of the statute consequently implicated his privacy rights. We disagree. Substantive due process rights are founded not upon state law but upon "deeply rooted notions of fundamental personal interests derived from the Constitution." *Mangels,* 789 F.2d at 839 (citing *Regents of the Univ. of Mich. v. Ewing,* 474 U.S. 214, 228–30, 106 S.Ct. 507, 515–16, 88 L.Ed.2d 523 (1985) (Powell, J., concurring)). While state statutes and regulations may inform our judgement regarding the scope of constitutional rights, they "fall far short of the kind of proof necessary" to establish a reasonable expectation of privacy. *Flanagan v. Munger,* 890 F.2d 1557, 1571 (10th Cir.1989). Mere allegations that an official failed to abide by state law will not suffice to state a constitutional claim. The disclosed information itself must warrant constitutional protection. *See Paul v. Davis,* 424 U.S. at 713, 96 S.Ct. at 1166. We have already concluded that Mr. Nilson's criminal history, despite the expungement order, is not protected by the constitutional right to privacy. It is therefore irrelevant to our inquiry whether Sergeant Brimhall violated the Utah expungement statute.

For the reasons stated in this opinion, we AFFIRM the district court's decision.[3]

WEST KEY NUMBER SYSTEM

3. Mr. Nilson argues that the district court erred in failing to assess damages for harm stemming from Sergeant Brimhall's disclosure. Because damages follow liability, we do not address this claim.

**In re Hugh Daniel DEPAOLO, dba Hugh D. DePaolo, M.D., dba Casper Birthing Center; and SIRI JANE DEPAOLO, Debtors.**

**Hugh Daniel DEPAOLO, dba Hugh D. DePaolo, M.D., dba Casper Birthing Center; and Siri Jane DePaolo, Appellees,**

**v.**

**UNITED STATES of America, acting through the INTERNAL REVENUE SERVICE, Appellant.**

**No. 94–8029.**

United States Court of Appeals, Tenth Circuit.

Jan. 9, 1995.

Chapter 11 debtors moved to reopen bankruptcy proceeding so that they could file declaratory judgment proceeding as to scope and effect of plan confirmation on notice of deficiency issued by Internal Revenue Service (IRS). The United States Bankruptcy Court for the District of Wyoming granted summary judgment for IRS, and debtors appealed. The District Court, Clarence A. Brimmer, Jr., J., 165 B.R. 491, reversed, and IRS appealed. The Court of Appeals, McKay, Circuit Judge, held that: (1) IRS was not barred by res judicata principles from assessing or collecting any additional taxes for certain tax year beyond those provided for in debtors' reorganization plan, and (2) IRS was not equitably estopped from pursuing additional tax liabilities for that tax year.

District court reversed and remanded with directions.

**1. Bankruptcy ⚷3352**

When taxes and additions at issue were of type specified in Bankruptcy Code section providing priority for certain tax claims, taxes were nondischargeable, even though Chapter 11 plan provided for repayment of tax debt. Bankr.Code, 11 U.S.C.A. §§ 507(a)(7), 523(a)(1)(A).

**2. Bankruptcy ⚷3568(2)**

Although confirmed Chapter 11 plan generally binds any creditor regardless of whether creditor's claim is impaired by plan or whether creditor accepted plan, the same is not true of creditor whose claim is nondischargeable. Bankr.Code, 11 U.S.C.A. § 1141(d)(2).

**3. Judgment ⚷636**

Principles of res judicata apply generally to bankruptcy proceedings.

**4. Bankruptcy ⚷3568(2)**

Res judicata principles did not bar Internal Revenue Service (IRS) from assessing or collecting additional taxes beyond those provided for in Chapter 11 debtors' reorganization plan, where IRS audited debtors' tax return after confirmation of plan, and taxes in question were nondischargeable. Bankr. Code, 11 U.S.C.A. §§ 507(a)(7), 523(a)(1)(A), 1141(d)(2).

**5. Bankruptcy ⚷2892.1, 3568(2), 3715(10)**

Congress, by expressly providing in Bankruptcy Code that certain taxes are not discharged whether or not claim for such taxes was filed or amended, has determined that Internal Revenue Service (IRS) may make claim for taxes for particular year in bankruptcy proceeding, accept judgment of bankruptcy court, and then audit and make additional claims for that same year, even though such conduct may seem inequitable or may impair debtor's fresh start. Bankr. Code, 11 U.S.C.A. § 523(a)(1)(A).

NHE Results for PIANTA,CAROL
***CONFIDENTIAL Patient Data from PITTSBURGH.MED.VA.GOV*** 11/12/04 PAGE 1
BIERLEY,HARRY 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 DOB: 01/19/1944

4542550 (814)

-------------------- PN - Progress Notes (12 months) --------------------

11/03/2004 11:30 Title: ENT(EAR/NOSE/THROAT)

HISTORY: I have seen Mr. Bierley in the past for chronic sore throat thought to be due to gastroesophageal reflux. Examination has been negative in the past. However, since his last visit with us he has had a unilateral sore throat, was seen by Dr. Stehler in Erie, who noted what appeared to be an abscess in his right oropharynx and recommended laser tonsillectomy for residual tonsil tissue.

msp
Dr Kirk Steehler, D.O.

PHYSICAL EXAMINATION: Examination today is unremarkable. Tympanic membrane, ear canal on the right side are normal. Careful inspection as well as palpation of the right tongue base and tonsillar fossa was unremarkable. Specifically, I was unable to appreciate any obvious residual tonsil tissue. Flexible laryngoscopy was performed and again demonstrate no abnormalities other than a normal anatomic variant to laryngeal anatomy with and Omega-shaped epiglottis and overlapping retinoid cartilages. No other lesions were identified.

IMPRESSION: This story is compatible with recurrent paratonsillar abscess occurring following prior tonsillectomy many years previously. Prior to embarking on surgical removal of the tonsillar fossa tissue, I would like to see him when he is actively infected. Please arrange for urgent transport to our facility at the time he is next infected and we can then identify the appropriate surgical procedure that would need to be performed.

DICTATED BY: DAVID EIBLING

DD: 11/03/04
DT: 11/04/04
GMS/LQL/JOB#1035788

Signed by: /es/ DAVID EIBLING
CHIEF OTOLARYNGOLOGY-HNS 11/05/2004 15:17

09/27/2004 15:00 Title: ENT(EAR/NOSE/THROAT)

CONSULT REQUEST #: 583200

HISTORY OF PRESENT ILLNESS: The patient is referred for evaluation of chronic unilateral sore throat. He has a long history of chronic sore throat, which is actually dated from about age 12. He has been treated with antibiotics periodically throughout the course the ears and antibiotics appeared to help the symptoms.

years

The patient was reevaluated recently and told that his symptoms

(4)

NHE Results for PIANTA,CAROL
***CONFIDENTIAL Patient Data from PITTSBURGH.MED.VA.GOV*** 11/12/04 PAGE 2
BIERLEY,HARRY 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 DOB: 01/19/1944
==========================================================================

****************** CONFIDENTIAL NHE EXTRACT SUMMARY pg. 2 ******************
BIERLEY,HARRY 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 DOB: 01/19/1944

-------------------- PN - Progress Notes (max 365 days) --------------------

were most likely due to chronic gastroesophageal reflux disease and was recommended that he is on Prilosec twice a day to be taken 30 minutes prior to meals. Since he has been doing this, recently he has noted some improvement, particularly in his voice, which he found easier to control than it was prior.

PAST MEDICAL HISTORY: Significant, he was a smoker until 1998, approximately one-half to three-quarter packs of cigarettes a day. He has never been a heavy drinker. He has known thyroid ✓ disease and also has difficulty with chronic sweating, particularly on the right side of his neck. He denies any previous neck surgery or neck trauma and has no evidence of Frey's syndrome.

10/10/1970

PHYSICAL EXAMINATION: A mildly deviated nasal septum towards the right side with absent middle turbinate secondary to prior sinus surgery of widely patent middle meatus on the left side. I was able to pass the scope into the sinus and noted no abnormalities. Nasopharynx was otherwise unremarkable with the flexible scope. Oral cavity revealed several missing teeth with partial plates. No mucosal lesions. Indirect laryngoscopy in tongue was unremarkable with exception of an omega-shaped epiglottis and overlapping retinoids. Finger palpation of his tongue base was unremarkable. Tonsils were absent with no evidence of any persistent residual disease in the tonsillar fossa.

A flexible fiberoptic laryngoscopy was performed. Vocal cords --- and supraglottic structures were normal with the exception of the previously noted overwriting retinoid cartilages and omega-shaped epiglottis.

Examination of his ears revealed old healed tympanic membrane perforation with surrounding scarring on the left side, right middle ear and eardrum was normal. There was no evidence of any middle ear fluid on either side.

Neck examination was unremarkable.

Examination of skin revealed multiple lesions on his skin that he states have been present for many years. These looked to be vesicular in nature. I believe the Dermatology evaluation is warranted.

IMPRESSION: The most likely possibility for his symptoms is gastroesophageal reflux. He seems to be improving on early in the course. I believe that if he does not improve, barium swallow should be obtained and this could easily be done at Erie.

DICTATED BY: DAVID EIBLING

D: 09/27/04
T: 09/27/04

5

NHE Results for PIANTA,CAROL PAGE 3
**CONFIDENTIAL Patient Data from PITTSBURGH.MED.VA.GOV*** 11/12/04
IERLEY,HARRY 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 DOB: 01/19/1944
==============================================================================

***************** CONFIDENTIAL NHE EXTRACT SUMMARY pg. 3 ****************** 11/12/2004 11:44
IERLEY,HARRY 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 DOB: 01/19/1944

-------------------- PN - Progress Notes (max 365 days) --------------------

MS/MIC/JOB#1022318

Signed by: /es/ DAVID EIBLING
CHIEF OTOLARYNGOLOGY-HNS 10/04/2004 14:13

IERLEY,HARRY 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 DOB: 01/19/1944

(6)





Entrez PubMed Nucleotide Protein Genome Structure OMIM PMC Journals Books

Search PubMed for Go Clear

Limits Preview/Index History Clipboard Details

Display Abstract Show: 20 Sort Send to Text

About Entrez

Text Version

Entrez PubMed
Overview
Help | FAQ
Tutorial
New/Noteworthy
E-Utilities

PubMed Services
Journals Database
MeSH Database
Single Citation Matcher
Batch Citation Matcher
Clinical Queries
LinkOut
Cubby

Related Resources
Order Documents
NLM Catalog
NLM Gateway
TOXNET
Consumer Health
Clinical Alerts
ClinicalTrials.gov
PubMed Central

☐ 1: Int J Pediatr Otorhinolaryngol. 1991 Apr;21(2):163-8. Related Articles, Li

## Laryngeal pathology in hearing-impaired children.

**Derkay CS, Thomsen JR, Grundfast KM.**

Department of Otolaryngology--Head and Neck Surgery, Eastern Virginia Medi School, Norfolk 23507.

Eighty-five children enrolled in a total communication elementary school for the severe-to-profoundly hearing-impaired were evaluated prospectively to assess th incidence of laryngeal abnormalities. Direct flexible laryngoscopy and indirect mirror laryngoscopy revealed vocal cord nodules in 3 children, omega-shape infantile epiglottis in 3 children, and normal larynges in the remaining 79 childre These findings suggest that severe-to-profoundly hearing-impaired children develop detectable laryngeal pathology at approximately the same frequency as previously reported by others for normal hearing children.

PMID: 1889953 [PubMed - indexed for MEDLINE]

Display Abstract Show: 20 Sort Send to Text

Write to the Help Desk
NCBI | NLM | NIH
Department of Health & Human Services
Privacy Statement | Freedom of Information Act | Disclaimer

Nov 8 2004 18:23:56





**From:** "Lloyd W. Hanson" <lloyd.hanson@n...>
"Lloyd W. Hanson" <lloyd.hanson@n...>
**Date:** Sun Aug 5, 2001 5:46 pm
**Subject:** Re: [vocalist] Rock aesthetics and singer's formant (to Mike) was: Seth Riggs...

Dear Win and Vocalisters:

Some Comments:

You state that there is a "very light adduction of the (vocal) folds" in mezza voce "whereby they produce much less higher harmonics" If the vocal folds are not adducted completely, the mezza voce quality will be breathy. But mezza voice, when correctly done, does not have a breathy component in the tone. I have not heard the example to which you are referring (by Scott Walker) but it may be that what you describe as his mezza voce is a simulation of this vocal technique with a breathy component present

Singer's Formant is merely a name given to the phenomenon of a very strong amplitude increase in the partial spectrum at about 2800 to 3200 Hrz. If that amplitude increase is not present there is, by definition, no Singer's Formant. The sound that is created by the vocal folds (phonated sound) must contain these partials if they are to be acoustically amplified by the vocal tract. Thus, producing phonated tone that is lacking in partials in the 2800-3200 Hrz range will not be capable of being converted into a Singer's Formant by the vocal tract. It is possible for the vocal folds to produce a partial spectrum that is weak in this Hrz area but richer above this area. This kind of overly bright voice would not contain nor produce a

12

Singer's Formant but it is not uncommon for many to consider the overly bright voice as a proof of the presence of Singer's Formant.

The Singer's Formant is successful in making the voice heard above a large orchestra because it is a strong spectrum of sound that is higher in frequency than the the orchestras greatest sonic strength (2800-3200 vrs 1500 Hrz). Also the Singer's Formant tends to trigger a strong response from the human ear because it resonates so well within the middle ear, which, interestingly enough, has the required similar acoustic area as that which produces the Singer's Formant in the vocal tract. An emphasis of partials above the level of Singers Formant will have an effect on the tonal quality of the voice but, contrary to popular belief, is not helpful in making the voice carry.

You state that "In mezza voce the epiglottis is more open than in 'normal' singing, so it could be that the SF is less pronounced". Can you give me some kind of reference to support the idea that the epiglottis is in this position for mezza voce singing? It may be obvious but I cannot remember having read that it is so positioned.

The "1 to 6 ratio between the tube diameters" you mention does occur in Sundburg and is also explained in Titze. The opening from the larynx into the pharynx via the aryepiglottic must sustain this ratio of difference in both the diameter and area if the Singer's Formant is to be present in the final tone. It is seriously questioned whether it is possible to "shape the epiglottis into a narrow tube by the aryepiglottic muscles" as Mike has stated is a teaching of the Estill school but clearly the ratio of 1 to 6 is created somewhere in this area and has been observed and documented by the above voice scientist and others.

Lowering the larynx has been one of the traditional methods of

(13)

creating this 1 to 6 ratio (and the resultant Singer's Formant) and, for this reason, has become a major function of voice teaching in much of northern Europe. Italian teaching does not emphasize the conscious lowering of the larynx but the results are often very similar.

A high larynx will shorten the pharyngeal space which, in turn, will tend to resonate the upper partials of the phonated sound giving the voice an overly bright quality. A high larynx will also tend to strongly emphasize the lowest partial of which its shortened space is capable. This will produce the yell or "call voice" quality which is characteristic of much of any kind of singing utilizing a high larynx.

The strapping muscles (so called) are the muscles that pull the larynx down. Some of these are under direct conscious control and can be activated by imitating a yawn. However, other strapping muscles are not as easily placed under conscious control and the singer must learn to maintain a larynx in an at-rest or slightly lower position through special exercises that activate these less directly controlled muscles with the desired result of maintaining an at-rest larynx. The stronger the vocal production, the more active and strong these strapping muscles must be. Classical vocal technique indirectly strengthens these muscles because they are necessary for the un-amplified dramatic use of the voice required for this kind of singing. Microphone singing does not require this degree of strength because the power can be supplied by the electrical amplification.

--

Lloyd W. Hanson, DMA
Professor of Voice and Vocal Pedagogy, Emeritus
Director of Opera-Theatre, 1987-1997
School of Performing Arts
Northern Arizona University
Flagstaff, AZ

